IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| OSAMEDE BROWN, | ) | CASE NO. 5:15-cv-00014 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |


Plaintiff Osamede Brown ("Plaintiff" or "Brown") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I.  Procedural History

Brown filed an application for SSI on May 10, 2011.  Tr. 42, 134, 143, 214-220.   She alleged a disability onset date of January 1, 2010.  Tr. 42, 134, 143, 214, 234.   Brown alleged disability due to seizures, narcolepsy, and sleep apnea.  Tr. 134, 143, 152, 238.  After initial denial by the state agency (Tr. 152-154) and denial upon reconsideration (Tr. 160-166), Brown

requested a hearing (Tr. 167).  A hearing was held before Administrative Law Judge Michael

Kaczmarek ("ALJ") on May 22, 2013.  Tr. 73-122.

In his August 6, 2013, decision (Tr. 39-68), the ALJ determined that Brown had not been

under a disability since May 10, 2011, the date the application was filed (Tr. 43).  Brown

requested review of the ALJ's decision by the Appeals Council.  Tr. 38.  On November 24, 2014,

the Appeals Council denied Brown's request for review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-6.

## II. Evidence[1]

**A.    Personal, educational, and vocational evidence**

Brown was born in 1985.  Tr.75, 214.   She was 27 years old at the time of the hearing.

Tr.  76.  She graduated from high school and attended college on a part-time basis.  Tr. 85-86,

238-239.  While attending college, as an accommodation for her medical conditions, her teachers

provided her with additional time to complete homework and tests.  Tr. 110.  Brown resides with

her mother in a one-story home.  Tr. 88-89.  Brown's older sister lived with Brown and her

mother for a period of time but, at the time of the hearing, Brown was living only with her

mother.  Tr. 88.

**B.    Medical evidence**

**1.    Treatment history**

Brown has a history of seizure disorder dating back to at least 1995.  Tr.  357-378, 387-

472.   Neurologist Dr. Morris Kinast, M.D., of the NeuroCare Center, Inc., treated Brown for her

seizures.[2]  Tr. 357-378, 387-472.  She has also received emergency room treatment for her

---

[1] Brown's arguments relate primarily to the ALJ's consideration of evidence regarding her seizures.  Thus, the evidence summarized herein relates generally to Brown's seizures.

[2] Brown's mother accompanied her to many of her medical visits.

2

seizures.  Tr. 403-404, 419-420, 564, 558.  On February 26, 2008, Brown underwent a left temporal lobectomy through the Cleveland Clinic.  Tr. 435.  Thereafter, she continued follow up and received treatment through the NeuroCare Center.  Tr. 435.  On April 29, 2008, Brown saw Dr. Kinast.  Tr. 435.  Brown had not had a seizure since her temporal lobectomy on February 26, 2008.  Tr. 435.  Dr. Kinast ordered blood work to check Brown's Dilantin[3] blood level.  Tr. 435. Blood work from June 26, 2008, showed that Brown's PTN (Dilantin)[4] level was 10 MCG/ML.[5] Tr. 512.   On June 30, 2008, Brown saw Dr. Kinast.  Tr. 378.  Brown had been seizure free.  Tr. 378.  Dr. Kinast noted that Brown's recent Dilantin level was 10.  Tr. 378.  During a September 15, 2008, visit with Dr. Kinast, Brown reported that she had been having headaches for the past couple weeks but she had been seizure free.  Tr. 377.

On October 27, 2008, Brown saw Dr. Gerardo Cisneros, M.D., to establish a new primary care relationship.  Tr. 292-293.  Brown relayed information regarding her ongoing seizures and indicated that, since her surgery in February 2008, she had only had one seizure.  Tr. 292.  On December 8, 2008, Brown saw Dr. Kinast again.  Tr. 376.  She reported that she had seizures in October and in November.  Tr. 376.  Both the October and November seizures occurred while she was sleeping.  Tr. 376.  Following the October seizure, she woke up with blood on her pillow and she also bit her tongue during the November seizure.  Tr. 376.  Dr. Kinast noted that Brown had been evaluated at the Cleveland Clinic in October and her Dilantin level was 10.5.  Tr. 376.

During a February 2009 visit with Dr. Kinast, Brown reported having a seizure in January.  Tr. 375.  She had bit her tongue and had trouble walking and talking.  Tr. 375.  The seizure lasted about two minutes.  Tr. 375.  Brown's mother indicated that Brown had had three

---

[3] Another name for Dilantin is phenytoin.  *See* http://www.fda.gov/Safety/MedWatch/SafetyInformation/ucm243476 htm.

[4] *See* Tr. 505 (indicating that PTN is also known as Dilantin).

[5] The normal/reference range for PTN levels is 10-20 MCG/ML.  Tr. 512.

seizures since her surgery.  Tr. 375.  Brown was scheduled for a follow up in April at the
Cleveland Clinic.  Tr. 375.  On May 4, 2009, Brown saw Dr. Kinast.  Tr. 374.  Brown had
remained seizure free.  Tr. 374.  She was taking Dilantin, Lyrica and Trileptal.  Tr. 374.  Dr.
Kinast noted that the Cleveland Clinic had increased Brown's Lyrica dosage.  Tr. 374.  Brown
reported she was still having three headaches per week and was seeing a new doctor for her
migraine headaches.  Tr. 374.  On July 13, 2009, Brown reported having one to two seizures per
month.  Tr. 373.  She sometimes woke up having bitten her tongue with blood on her pillow and
drool.  Tr. 373.  At times, she would have a mild headache and, other times, she would have
slurred speech.  Tr. 373.  Because Brown was having problems with snoring and seizures in her
sleep, Dr. Kinast recommended that Brown undergo a polysomnogram to rule out sleep apnea.
Tr. 373.  When Brown saw Dr. Kinast on September 9, 2009, Brown had undergone the
recommended sleep study, which showed mild sleep apnea.  Tr. 372, 389-391.  Brown had been
seizure free and her headaches were under good control.  Tr. 372.  In addition to his prior
diagnosis of complex partial seizures, Dr. Kinast added sleep apnea as a diagnosis.  Tr. 372.

Upon Dr. Kinast's request, on October 20, 2009, Dr. James R. Bavis, Jr., M.D., of the
NeuroCare Sleep Center, saw Brown for a sleep medicine consultation.  Tr. 379-381.  On
October 20, 2009, Dr. Bavis reported that he suspected that Brown had narcolepsy.  Tr. 380.  He
recommended a multiple sleep latency test.  Tr. 380.  Dr. Bavis also opined that Brown had mild
obstructive sleep apnea and did not believe that her sleep apnea needed to be aggressively
treated.  Tr. 380.

During her December 14, 2009, follow up visit with Dr. Kinast, Brown reported having
two seizures in November and one in December.  Tr. 371.  The seizures occurred while she was
sleeping.  Tr. 371.  In one instance, Brown had persistent slurring of her speech after waking up.

Tr. 371.  Dr. Kinast noted that Brown's recent multiple sleep latency study had been normal.  Tr. 371.  Brown reported intermittent tremors.  Tr. 371.  Dr. Kinast increased Brown's Lyrica dosage, continued her on Dilantin and Trileptal, and recommended follow up in six weeks.  Tr. 371.

Brown saw Dr. Kinast on January 25, 2010.  Tr. 370.  Brown had had two more seizures that month.  Tr. 370.  The seizures were briefer than they had been.  Tr. 370.  Brown was taking Ritalin for her narcolepsy, which she reported was helping with her sleepiness.  Tr. 370.  Dr. Kinast was concerned that Brown was having too many breakthrough seizures and recommended that she start taking Vimpat in addition to the Dilantin and Lyrica that she had been taking.  Tr. 370.  On March 25, 2010, Brown saw Dr. Kinast and reported having a seizure in February and two in March.  Tr. 369.  The seizures had occurred while Brown was sleeping.  Tr. 369.  She had bitten her tongue.  Tr. 369.  She also had trouble breathing and a headache.  Tr. 369.  Brown reported dizziness from the Lyrica so Dr. Kinast recommended tapering her off of Lyrica.  Tr. 369.

Brown underwent narcolepsy genetic testing and, on April 13, 2010, Dr. Bavis informed Brown that she had tested positive for narcolepsy.  Tr. 367.  During the visit, Brown's mother indicated that, although the sleep study showed mild obstructive sleep apnea, she had witnessed some severe apnea.  Tr. 367.  Dr. Bavis noted that Brown's mother had implied but, when asked directly, denied that there might be some connection with Brown's sleep apnea events and her nighttime seizures.  Tr. 367.  Dr. Bavis adjusted Brown's narcolepsy medication to address Brown's concern that she was getting a little hyper after her second daily dose of narcolepsy medication.  Tr. 368.  While Brown's obstructive sleep apnea was mild, Dr. Bavis indicated he

was going to start Brown on a CPAP because she was not reducing her weight and her mother was concerned about the apnea.[6]  Tr. 367.

On May 3, 2010, Brown saw Dr. Kinast.  Tr. 366.  She was off Lyrica and was not having problems with dizziness.  Tr. 366.  She reported problems with tremors and having had two seizures in April while she was sleeping.  Tr. 366.  She had bitten her tongue during the seizures.  Tr. 366.  Dr. Kinast noted a fine tremor in Brown's outstretched hands.  Tr. 366.  He also noted that Brown's Dilantin level was 7 on May 1, 2010.  Tr. 366.  Dr. Kinast recommended no changes to Brown's anticonvulsant medications, which included 200 mg Dilantin three times per day.  Tr. 366.

During an August 9, 2010, visit with Dr. Kinast, Brown reported four seizures in June, one in July, and one in August.  Tr. 365.  Dr. Kinast noted that Brown was taking Dilantin twice a day not three times a day.  Tr. 365.  Her recent phenytoin level was 4.  Tr. 365.  She had started a new birth control pill.  Tr. 365.  Brown reported that she had been feeling "weird" lately.  Tr. 365.  Dr. Kinast recommended an increase in Brown's Dilantin dosage to 300/200 mg per day.  Tr. 365.  He also recommended that she speak with her OB/GYN about switching birth control pills.  Tr. 365.

On October 5, 2010, Brown saw Dr. Kinast and reported having a couple seizures the prior month that were shorter in duration and Brown came out of them quicker than she had in the past.  Tr. 364.  Dr. Kinast noted that Brown's recent phenytoin level was 8.8.  Tr. 364.  Dr. Kinast indicated that he believed that Dilantin was most effective in controlling Brown's seizures and he recommended increasing her Dilantin dosage to 300 mg twice per day and obtaining another blood level in a month.  Tr. 364.

---

[6] Brown continued to receive follow up treatment for her narcolepsy and obstructive sleep apnea through 2013. *See e.g.,* Tr. 355-356, 358-359, 361, 362-363, 660-662.

On January 10, 2011, Brown saw Dr. Kinast and reported having brief, i.e, lasting no longer than a minute, seizures once or twice per month.  Tr. 360.  Dr. Kinast continued Brown's current medication – Vimpat 100 b.i.d, Trileptal 1200 b.i.d., Dilantin 300 b.i.d. (Dextroamphetamine per Dr. Bavis) – indicating he was "very pleased with her progress at this time."  Tr. 360.

On February 11, 2011, Brown saw Dr. Bavis for follow up regarding her narcolepsy.  Tr. 358-359.  Brown was continuing to have episodes of dizziness and lightheadedness as well as tremors.  Tr. 358.  Her dizziness and lightheadedness tended to occur when she took her dextroamphetamine and seizure medication the week before or during her menstrual period.  Tr. 358.  Dr. Bavis believed that the dextroamphetamine was helping treat Brown's narcolepsy but he was concerned that the medication was contributing to the dizziness and tremors that Brown was experiencing and recommended an EMG and ordered blood work.  Tr. 358.   Also, due to Brown's reports of there being periods during the day when she was "transiently not doing well with focus  and thinking beyond that which she might normally have just from being sleepy," Dr. Bavis also ordered an EEG with a recommendation for follow up with Dr. Kinast.  Tr. 358. Blood work from February 12, 2011, showed that Brown's PTN level was 5.  Tr. 502.

On April 11, 2011, Brown reported to Dr. Kinast that she was having problems with dizziness while taking the Vimpat and she did not want to take a higher dose.  Tr. 357.  Dr. Kinast continued the same medication but indicated that he might add Benzyl to her medication regimen.[7]  Tr. 357.

On June 6, 2011, Brown saw Dr. Kinast and reported that she had had five seizures in the past month, which she attributed to the heat.  Tr. 353.  Dr. Kinast noted that the EEG ordered by

---

[7] Brown was prescribed Vimpat 100 b.i.d., Trileptal 1200 b.i.d., Vyvanse b.i.d., and dextroamphetamine per Dr. Bavis.  Tr. 357.  It is not clear whether Brown was prescribed Dilantin on April 11, 2011.

Dr. Bavis showed temporal slowing and sharp waves.  Tr. 353.  Dr. Kinast also noted that Brown "still had not been able to get Social Security benefits even though she most definitely deserves it."  Tr. 353.  Because Brown was continuing to have refractory seizures, Dr. Kinast recommended treating Brown with Benzyl at an initial dosage of 200 mg b.i.d. and gradually building to 1600 mg b.i.d.  Tr. 353.

During her August 23, 2011, visit with Dr. Kinast, Brown reported having two seizures the previous day but noted that overall she felt that her seizures had decreased in frequency since Dr. Kinast had started her on Benzyl.  Tr. 351.  Brown did not report side effects from the Benzyl.  Tr. 351.  Dr. Kinast recommended that Brown continue on her current medication regimen – Vimpat 100 mg b.i.d., Triliptel 1200 mg b.i.d., Dilantin 300 mg b.i.d., Benzyl 1600 mg b.i.d., (dextroamphetamine per Dr. Bavis) – and schedule a Dilantin blood level check.  Tr. 351.  Brown's Dilantin level on August 23, 2011, was "<2.5 L."  Tr. 323, 501.

On November 7, 2011, Brown saw Dr. Bavis and reported that she was doing well with her sleep and feeling rested in the morning.  Tr. 382-383.  On November 29, 2011, Brown saw Dr. Kinast and reported that she was averaging two seizures per month.  Tr. 547.  She indicated that her seizures were milder since she had been taking Benzyl.  Tr. 547.  She stated that her seizures involved staring, widening of the palpebral fissures, drooling and tongue biting.  Tr. 547.  Brown reported that her seizures lasted about two and a half minutes and then she slept for five hours and woke up with a headache and feeling weak and achy.  Tr. 547.  Brown was taking Vimpat b.i.d., Trileptal b.i.d., Dilantin b.i.d., Banzel b.i.d., and amphetamine-dextroamphetamine per Dr. Bavis.  Tr. 547.  Dr. Kinast recommended increasing Brown's Vimpat dose from 100 to 150 mg b.i.d. and indicated that he would like to try to wean her off the Trileptal.  Tr. 547-548.

Brown returned to see Dr. Kinast on January 23, 2012.  Tr. 544.  Brown reported doing well on her current anticonvulsants.  Tr. 544.  She had had only one seizure since seeing Dr. Kinast on November 29, 2011, which had occurred on January 17, 2012.  Tr. 544.  The January 17, 2012, seizure was brief in duration, lasting less than one minute.  Tr. 544.  She knew that the seizure was coming.  Tr. 544.  She reported having occasional headaches but no severe migraine headaches for the past couple months.  Tr. 544.  Dr. Kinast noted that Brown had been denied social security again and encouraged her to apply again.  Tr. 544.  Dr. Kinast also noted that he was "pleased with her progress" and would continue the same medication regimen.  Tr. 544.  Dr. Kinast ordered a Dilantin blood work which showed a level of "<2.5 L."  Tr. 545-546.

On February 28, 2012, Brown presented to Mercy Medical Center's emergency room reporting a seizure.  Tr. 564.  Initially, Brown indicated that she was taking her medications but, after talking with the emergency medical personnel and being advised that her blood level was zero,[8] Brown admitted that she had been cutting back on her medication because she was feeling dizzy.  Tr. 564.  Brown was administered Tylenol and Dilantin and counseled regarding the need to take her Dilantin or risk breakthrough seizures.  Tr. 564.  The emergency room department's assessment was "[a]cute breakthrough seizure secondary to noncompliance."  Tr. 564.

While visiting her sister at Mercy Medical Center on April 4, 2012, Brown had a seizure.  Tr. 558-563.  Brown reported being very emotional during her hospital visit she was having with her family.  Tr. 558.  On physical examination, Brown was observed to be actively seizing and foaming at the mouth.  Tr. 559.  Brown was observed opening her eyes at times and coming out of the seizure for a bit and then closing her eyes.  Tr. 559.  Lab work showed that Brown's Dilantin level was less than 0.4.  Tr. 558, 563.  The emergency room physician Dr. Bradley

---

[8] Lab results show that Brown's PTN level on February 28, 2012, was 0.4.  Tr. 567.

McKenney, M.D., diagnosed seizure, noting his belief that Brown's seizure was the result of noncompliance and stress.  Tr. 558.

Thereafter, on April 16, 2012, Brown saw Dr. Kinast and reported two brief seizures the past month.  Tr. 540.  She indicated that the seizures were stress induced, noting that her sister was recently hospitalized after a fall and her mother had a new job.  Tr. 540.  Dr. Kinast continued Brown on her current regimen of anticonvulsants.  Tr. 540.

Brown saw Dr. Kinast on July 16, 2012, and reported having three seizures in the past month but could not recall how many seizures she had in the previous two months.  Tr. 577.  Her headaches had not been a problem.  Tr. 577.  She was continuing to take Vimpat, Trileptal, Dilantin, and Benzyl.  Tr. 577.  She indicated that she was planning on going back to college at Stark State.  Tr. 577.  Dr. Kinast recommended increasing Brown's Vimpat dose from 150 mg b.i.d. to 200 mg bi.d.  Tr. 577.

On December 18, 2012, Brown saw Dr. Kinast and reported that she was averaging two seizures per month.  Tr. 604.  The seizures were usually occurring while she was sleeping.  Tr. 604.  She was waking up moaning, making a whimpering sound and her mother would find her appearing incoherent with her eyelids twitching.  Tr. 604.  Brown was biting her tongue and would have a headache.  Tr. 604.  Brown also reported having about six headaches each day.  Tr. 604.  She was sometimes able to continue with daily activities but often had to lie down.  Tr. 604.  She was attending Stark State.  Tr. 604.  The nurse's notes from her December 18, 2012, visit with Dr. Kinast reflect that Brown was unable to state what medications she was on.  Tr. 675.  She thought she was still taking only 100 mg of Vimpat and Adderall.  Tr. 675.  Dr. Kinast recommended checking Brown's Dilantin levels and a follow up MRI to reassess Brown's Chiari

malformation.  Tr. 605.  A January 3, 2013, brain MRI showed mild Chiari I malformation, no hydrocephalus, and postoperative changes with no acute intracranial abnormality.  Tr. 619.

Brown saw Dr. Bavis on February 1, 2013.  Tr. 626-628.  She reported that she had been off of her medication and felt that she was not doing well while off her medication.  Tr. 626. Physical examination findings were normal.  Tr. 628.  Dr. Bavis refilled Brown's low dose Adderall.  Tr. 628.

On April 5, 2013, upon referral by her primary care physician, Brown saw Dr. Vishal Sawhney, M.D., for evaluation and management of her asthma and obstructive sleep apnea.  Tr. 638-643.  Brown had not been using her CPAP machine for a few months because of intolerance to PAP.  Tr. 638.  Brown reported loud and persistent snoring, frequent nighttime awakenings and headaches.  Tr. 638.  She denied difficulty with concentration, tremors or memory loss.  Tr. 640. Dr. Sawhney's recommendations included adjustments to her asthma medication and a new sleep study to reassess Brown's obstructive sleep apnea.  Tr. 642.

On April 9, 2013, Brown saw Dr. Kinast.  Tr. 632.  Brown reported that she was not having headaches.  Tr. 632.  She was averaging two seizures per month.  Tr. 632.  She explained to Dr. Kinast "that she has weird feeling as if something is going to happen.  She loses consciousness.  If her mother witnesses the seizure she will have stiffening and jerking of her limbs."  Tr. 632.   Dr. Kinast indicated that Brown's most recent Dilantin level was 2.5.  Tr. 632. She was taking 300 mg b.i.d.  Tr. 632.  Dr. Kinast's goal was to wean Brown off of Dilantin.  Tr. 632.  Dr. Kinast indicated he had had little success in the past trying to wean Brown off of Dilantin but noted that Brown's blood levels were very low so he recommended reducing her Dilantin dosage to 300/200 with follow up in three months.  Tr. 632.  Lab work performed on June 24, 2013, reflected a PTN level of 1.1.  Tr. 669.

During a July 9, 2013, visit with Dr. Kinast, Brown reported doing well and averaging one seizure per month over the prior two months.  Tr. 663.  Brown's seizures had occurred while she was sleeping.  Tr. 663.  During a seizure in June, Brown experienced jerking of her limbs and had bitten her tongue.  Tr. 663.  In July, following a seizure, she woke up confused and had bitten her tongue.  Tr. 663.  She reported having an aura or warning feeling that lasted for a few days before a seizure.  Tr. 663, 665.  Brown was not having headaches and her sleep apnea and narcolepsy were under good control.  Tr. 663.  Dr. Kinast recommended that Brown take an additional dose of Vimpat on those days when she was experiencing the aura she described.  Tr. 665.

### 2.    Seizure journal

For the period of January 2011 through April 2013, Brown's mother kept notes in a journal regarding Brown's seizures, i.e., frequency, time of day, and symptoms.  Tr. 78-79, 96, 259-263, 652-653.

### 3.    Opinion evidence

#### a.    Treating source

##### i.    Morris Kinast, M.D. – NeuroCare Center, Inc.

On October 10, 2011, Brown's treating neurologist Dr. Kinast completed a *Seizures Residual Functional Capacity Questionnaire*.  Tr. 336-340.  Dr. Kinast reported that he had treated Brown for seizures since 2007.  Tr. 336.  Dr. Kinast's diagnosis was complex partial seizures with secondary generalization.  Tr. 336.  He indicated that Brown did not lose consciousness when she had a seizure.  Tr. 336.  When asked about the average frequency of Brown's seizures, Dr. Kinast responded "none right now."  Tr. 336.  Dr. Kinast indicated that he did not know the date of Brown's last three seizures.  Tr. 336.  He indicated that Brown's

seizures lasted 30 seconds to 2 minutes.  Tr. 336.  Dr. Kinast indicated that Brown did not always have a warning of an impending seizure and could not always take safety precautions when she sensed a seizure coming on.  Tr. 337.  Dr. Kinast reported that Brown's seizures did not occur at a particular time of day and there were no precipitating factors such as stress or exertion that caused a seizure.  Tr. 337.  Dr. Kinast indicated that the following action must be taken during and immediately after Brown has a seizure: loosen tight clothing, clear the area of hard or sharp objects, and after the seizure, turn Brown on her side to allow for her saliva to drain from her mouth.  Tr. 337.  Dr. Kinast indicated that Brown had the following postictal manifestations: confusion and exhaustion, which lasted for two to six hours following a seizure and required Brown to rest after.  Tr. 337.   Dr. Kinast stated that Brown had a history of injury with her seizures but did not have a history of fecal or urinary incontinence during a seizure.  Tr. 338.

Dr. Kinast indicated that Brown was compliant with her medication and had no side effects from her medication.  Tr. 338.  In response to a question asking whether Brown's blood levels of anticonvulsant medication had been at less than therapeutic levels, Dr. Kinast drew a line through the answer space.  Tr. 338.

Dr. Kinast opined that Brown did not suffer from ethanol related seizures or ethanol and/or other drug abuse.  Tr. 338.  Dr. Kinast opined that Brown's seizures would likely disrupt the work of co-workers but also opined that Brown would not require more supervision at work than an unimpaired worker.  Tr. 338.  Dr. Kinast opined that Brown could not work at heights; could not work with power machines that required an alert operator; and could not operate a motor vehicle.  Tr. 338.  Dr. Kinast opined that Brown could take the bus alone.  Tr. 338.   Dr. Kinast opined that Brown would not need unscheduled breaks during an 8-hour workday.   Tr. 339.  Dr. Kinast opined that Brown could tolerate moderate work stress.  Tr. 339.  Dr. Kinast

opined that Brown's impairments would result in both good and bad days and he estimated Brown would   likely be absent from work twice a month because of her impairments or treatment.  Tr. 339.   When asked to identify any additional tests or procedures that Dr. Kinast would recommend to fully assess Brown's impairments, symptoms and limitations, he drew a line through the answer space.  Tr. 340.

### ii.        James Bavis, M.D. – NeuroCare Center, Inc.

On October 10, 2011, Brown's sleep specialist Dr. Bavis completed a *Sleep Disorders Residual Functional Capacity Questionnaire*.  Tr. 343-347.  Dr. Bavis indicated that he treated Brown for narcolepsy and constant sleepiness since 2009.  Tr. 343.   Dr. Bavis's diagnosis, which he indicated was supported by sleep studies, was narcolepsy without cataplexy.   Tr. 343. Brown's symptoms, which lasted from one to three hours, included sleep paralysis, sleep attacks, excessive daytime sleepiness, and fatigue.  Tr. 343-344.  Dr. Bavis reported that Brown was taking medication as prescribed and her prognosis was good.  Tr. 345.  Based on Brown's narcolepsy, Dr. Bavis opined that Brown should avoid work involving climbing heights; should avoid power machines, moving machinery, or other hazardous conditions; and should limit or avoid operation of motor vehicles.  Tr. 345.  Dr. Bavis also opined that Brown would have serious limitations in being punctual within customary, usually strict tolerances, on a sustained basis.  Tr. 346.  He opined that Brown's impairment would likely produce both good and bad days and she would likely be absent from work about three times per month as a result of her impairment or treatment.  Tr. 346.

### b.        Reviewing physicians

On August 16, 2011, state agency reviewing physician, Edmond Gardner, M.D., completed a physical RFC assessment.  Tr. 138-139.  Dr. Gardner opined that Brown had the

RFC to perform work with no exertional, no manipulative, no visual and no communicative limitations but could never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards (machinery, heights, etc.).  Tr. 138-139.   Dr. Gardner's limitations were based on Brown's seizure disorder.  Tr. 138-139.   In assessing Brown's RFC, Dr. Gardner adopted a prior ALJ's June 23, 2009, RFC under the *Drummond* ruling.  Tr. 139.

Upon reconsideration, on December 6, 2011, state agency reviewing physician, Steve E. McKee, M.D., completed an RFC assessment.  Tr. 148-149.  Dr. McKee's assessment mirrored Dr. Gardner's, including the adoption of a prior ALJ's June 23, 2009, RFC under the *Drummond* ruling.  Tr. 148-149.   However, Dr. McKee added to his explanation that, in an October 2011, seizure questionnaire, Dr. Kinast (NeuroCare) indicated that Brown was not having seizures currently.  Tr. 149.

**C.      Testimonial evidence**

**1.       Plaintiff's testimony**

Brown was represented by counsel and testified at the hearing.  Tr. 75-76, 85-115, 119-120.   In August 2012 Brown started taking college classes part-time at Stark State.  Tr. 85-86.  She was taking classes two days each week.  Tr. 86, 105-106.   Brown estimated missing two days of school each month.  Tr. 105-106.   Brown has never had a job.  Tr. 86-87.  Her mother has supported her and she receives a monthly check of $115.00 from Child and Family Services.  Tr. 86-87.

Brown indicated that her seizures prevent her from working.  Tr. 89.  She has had seizures since she was nine years old.  Tr. 95.  She had surgery in February 2008 and did not experience seizures until October 2008.  Tr. 107-109.  When asked to describe her seizures, Brown indicated that she feels weird, out of order and then passes out.  Tr. 94.  When she wakes

up, she has a migraine and she feels really tired and weak.  Tr. 89, 94.   Brown's headaches following a seizure last about two hours.  Tr. 105.  Brown estimated having usually two, sometimes three, seizures per month.  Tr. 95.  She thinks her seizures last a few minutes.  Tr. 95.  Her seizures usually occur at night when she is sleeping.  Tr. 95.  She knows she has had a seizure at night because she wakes up with blood on her pillow from biting her tongue, she has a migraine, and she feels both sleepy and muscle tired.  Tr. 95-96, 105.  When Brown has a seizure at night, Brown usually sleeps continuously for about four or five hours the following day.  Tr. 96-98, 105.  She is wiped out and just stays in bed and sleeps.  Tr. 107.  If she has class scheduled on the day following a seizure, she does not attend class.  Tr. 105.   Stress sometimes triggers her seizures.  Tr. 110-111.  Brown's mom has recorded information regarding Brown's seizures in a journal.  Tr. 96.

Brown's last seizure prior to the May 22, 2013, hearing was on March 17, 2013.  Tr. 103.  She was sleeping when the seizure occurred.  Tr. 104.  Brown's mom informed Brown that she observed Brown waking up, crying, being in some pain because of a headache, and going back to sleep.  Tr. 104.  Brown did not know how long the seizure lasted.  Tr. 104.  Her mother told her it lasted about the usual length, i.e., two or a few minutes.  Tr. 104, 119-120.

Brown also has sleeping problems due to narcolepsy.  Tr. 89, 98.   She has had narcolepsy for a few years.  Tr. 98-99.  As a result of her narcolepsy, it is hard for her to stay awake and she is sleepy every day.  Tr. 89, 98.   Brown dozes off for a few minutes once or twice during her classes.  Tr. 106-107.  Brown was taking Adderall for her narcolepsy.  Tr. 99.  With the medication, she still feels sleepy but it helps her stay awake and she does not have problems with falling asleep.  Tr. 99.

Brown also has breathing problems for which she uses an inhaler twice a day.  Tr. 89, 98, 100-102.  Even with the inhaler, Brown still has trouble breathing.  Tr. 100.  For example, she stated that, if she walks too far, it is hard for her to breathe.  Tr. 100.  Brown has also used a CPAP machine to help her breathe at night.  Tr. 102.  She stopped using the CPAP machine for a period of time because the mask was hard for her to get on.  Tr. 102-103.  Also, she felt that her breathing was getting better without the use of the machine.  Tr. 103.

Brown does not drive and has never had a driver's license.  Tr. 89, 109.  Brown's mom works so Brown is home alone for most of the day.  Tr. 90.  She spends her days drawing, watching television, and cooking herself breakfast and lunch.  Tr. 90.  About twice a week, she cooks dinner for her mom.  Tr. 90.  Brown and her mother occasionally go out to eat.  Tr. 90.  Brown uses a computer for school.  Tr. 91.  Brown's aunt visits with Brown and her mom once or twice a month.  Tr. 89.  Once a month, Brown goes grocery shopping with her mom.  Tr. 92.  When attending her college classes, Brown takes the bus to school.  Tr. 92.  The bus ride to school is about 45 minutes.  Tr. 92.

In or around 2010, Brown's mother had hip surgery so Brown had to stop attending college to help with her mom.  Tr. 93-94.  Her mom's recovery lasted a few months.  Tr. 94.  Brown's sister was living her and her mom at that time so Brown and her sister helped their mom during her recovery.  Tr. 94.

### 2.      Vocational expert's testimony

Vocational Expert Brian Womer ("VE") testified at the hearing.  Tr.  112-116.  The ALJ asked the VE whether there would be work available for a hypothetical individual the same age as and with the same education and work history as Brown who has an RFC with no exertional limitations but with the following limitations: can never climb ladders, ropes, and scaffolds; must

avoid all exposure to hazards such as inherently dangerous moving machinery and unprotected heights; must avoid concentrated exposure to environmental irritants, such as fumes, odors, dusts, gases, and areas of poor ventilation; and no commercial driving.  Tr. 112-113.  The VE indicated that, considering those restrictions, the following jobs would be available: (1) hand packager, a medium, unskilled job with approximately 7,200 positions in Ohio and 860,000 nationwide; (2) machine packager,[9] a medium, unskilled job with approximately 6,500 positions in Ohio and 325,000 nationwide; and (3) kitchen helper, a medium, unskilled job with approximately 30,400 in Ohio and 3.2 million nationwide.  Tr. 113-114.

For his second hypothetical, the ALJ asked the VE to assume an individual described in the first hypothetical with the additional limitation of having to avoid concentrated exposure to excessive heat, cold, and humidity.   Tr. 114.  The VE indicated that the additional limitation would not affect the availability of the three identified jobs.  Tr. 114.

For his third hypothetical, the ALJ asked the VE to consider the following additional limitations: limited to simple, routine, repetitive tasks in a low-stress, static environment with infrequent changes and, when changes occurred, those changes would be explained and/or demonstrated and could be learned in 30 days or less; no fast pace or strict production or time quotas; and no responsibility for the health or safety of others.  Tr. 115.  The VE indicated that, with the additional limitation, the previously identified jobs would remain available.  Tr. 115.

In response to questioning from Brown's counsel, the VE indicated that, if an individual would be absent from work two days per month, the individual would not be able to maintain the jobs the VE identified and there were no additional jobs that the VE could identify.  Tr. 115-116.

---

[9] The VE indicated that the machine packager position would involve working with a machine but confirmed that it would not be considered to be inherently dangerous or hazardous and therefore fit within the limitation in the hypothetical of avoiding inherently dangerous moving machinery.  Tr. 114.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled

19

if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 6, 2013, decision, the ALJ made the following findings:[10]

1. Brown had not engaged in substantial gainful activity since May 10, 2011, the application date.  Tr. 45.

2. Brown had the following severe impairments: seizure disorder diagnosed as complex partial seizures with history of *grand mal* seizure diagnosis, status post ("s/p") February 2008 left temporal lobectomy; history of asthma progressing to chronic obstructive pulmonary disease ("COPD"); morbid obesity; narcolepsy versus hypersomnia, NOS.  Tr. 45.  Brown had the following non-severe impairments: vitamin-D deficiency; Chiari I malformation; migraine headaches; obstructive sleep apnea; carpal tunnel syndrome; and adjustment disorder with mixed depressed mood and anxiety.  Tr. 45-49.

3. Brown did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including Listings 11.02 – *Convulsive epilepsy* - and 11.03 – *Nonconvulsive epilepsy.*  Tr. 49-51.

4. Brown had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: can never climb ladders, ropes, or scaffolds; should avoid all exposure to hazards, such as inherently dangerous moving machinery and unprotected heights; cannot engage in commercial driving; should avoid concentrated exposure to excessive heat, cold, and humidity and to environmental irritants such as

---

[10] The ALJ's findings are summarized.

fumes, odors, dust, gases, and areas of poor ventilation; can understand, remember, and carry out simple, routine, and repetitive tasks that could be learned in 30 days or less; and requires a low stress, static work environment with infrequent changes, and those changes that did occur would be explained and/or demonstrated to her; with no fast pace or strict production/time quotas; and with her not being responsible for the health or safety of others.  Tr. 51-61.

5. Brown had no past relevant work.  Tr. 61.

6. Brown was born in 1985 and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 61.

7. Brown had at least a high school education and was able to communicate in English. Tr. 61.

8. Transferability of job skills was not an issue because Brown did not have past relevant work. Tr. 61.

9. Considering Brown's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Brown could perform, including hand packager, machine packager, and kitchen helper.  Tr. 61-62.

Based on the foregoing, the ALJ determined that Brown had not been under a disability from since May 10, 2011, the date the application was filed.  Tr. 62-63.

## V. Parties' Arguments

Brown argues that the ALJ erred in giving the opinions of her treating physicians Dr. Kinast and Dr. Bavis little weight, arguing that the reasons the ALJ provided were not "good reasons."  Doc. 12, pp. 14-23.  Brown also argues that the ALJ erred in assessing her credibility. Doc. 12, pp. 23-24.  With respect to both arguments, Brown contends that the ALJ improperly analyzed the issue of her medication compliance and suggests that the ALJ should have consulted a medical expert and/or re-contacted Dr. Kinast to ask for clarification regarding her sub-therapeutic phenytoin levels.  Doc. 12, pp. 20-23, 24.

In response, the Commissioner argues that the ALJ properly considered the opinion of Brown's treating neurologist and sufficiently explained the basis for assigning little weight to his opinion.[11]  Doc. 15, pp. 10-17.  The Commissioner also argues that the ALJ properly assessed Brown's credibility and reasonably concluded that Brown was not compliant with anti-seizure medication based on continual sub-therapeutic drug levels.  Doc. 15, pp. 17-22.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

---

[11] The Commissioner contends that, while Brown refers to the ALJ's consideration of Dr. Bavis's opinion, Brown's only challenge is to the ALJ's evaluation of Dr. Kinast's opinion.  Doc. 15, p. 10, n. 4.  The Commissioner also adds that, to the extent that Dr. Bavis opined that Brown would miss at least two days of work per month, the ALJ assessment of both opinions was the same.  Doc. 15, p. 10, n. 4.

477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's

decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc.*

*Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.      The ALJ evaluated the treating source opinions in accordance with the treating physician rule**

Brown contends that the ALJ erred in assigning little weight to the October 10, 2011,

opinions of her treating neurologist Dr. Kinast and treating sleep specialist Dr. Bavis, arguing

that the reasons the ALJ provided were not "good reasons."[12]  Doc. 12, pp. 14-23.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling

weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the

other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d

365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc.*

*Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must

give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent

reviewers the weight given to the treating physician's opinion and the reasons for that weight.

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ

must consider factors such as (1) the length of the treatment relationship and the frequency of the

examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the

opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of

the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v.*

---

[12] Brown's arguments are focused primarily on Dr. Kinast's opinion.  However, in a footnote, Brown states that the ALJ combined his analysis of Dr. Kinast's opinion with the opinion of Dr. Bavis (who treated Brown for narcolepsy (Tr. 343-347)) and therefore her arguments with respect to the ALJ's assessment of Dr. Kinast's opinion apply to the ALJ's assignment of little weight to the opinion of Dr. Bavis.  Doc. 12, p. 14, n. 2.

*Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Consistent with the treating physician rule, the ALJ discussed and explained the weight assigned to the opinions of Dr. Kinast and Dr. Bavis, stating:

> As for the opinion evidence, counsel cites to October 10, 2011 "Seizures" and "Sleep Disorders" Residual Functional Capacity Questionnaires respectively completed by Drs. Kinast and Bavis in support of the allegedly disabling seizure disorder and narcolepsy because of their common opinion for likely absenteeism two or more days per month as a result of symptoms (Ex. B5F/5-6; B6F/5-6).  As discussed earlier, their reports that the claimant is fully compliant with taking her medications is deterred by evidence to the contrary, seriously weakening the accuracy and persuasiveness of their opinions.  Dr. Kinast also noted her [seizures are] likely to disrupt the work of co-workers, which seems driven only by the event of a daytime seizure which she reports to be infrequent in comparison to the nighttime events.  Several of the accounted symptoms of postictal confusion and exhaustion for up to six hours, sleep paralysis, and three-hour "spells" of fatigue and excessive daytime sleepiness obviously derive solely from the claimant's self-report to these physicians and are not corroborated in duration and extent by the treatment notes.
>
> Furthermore, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  While it is difficult to confirm the presence of such motive, it is more likely present in situations where the treating physician's own treatment notes, as Dr. Kinast's do at several points here, expressly offer such advocacy for disability benefits and when such advocacy is presented in the face of completely normal objective medical findings, relatively stable prescribed treatment, subjective reports of improved seizures and even "seizure free" periods, his own clinical reports of being "pleased with her progress," and the weight of the evidence in general—all of which are patent in the current case (*see* Ex. B4F/5 ["has still not been able to get Social Security benefits even though she most definitely deserves it"]; B10F/6 [January 2012 directive to continue applying for disability benefits]).
>
> Although little weight was given to this portion of the claimant's treating physicians' opinion for these reasons, the undersigned assigned partial weight to the balance of their opinions that corroborate the same precautionary environmental limitations as found by ALJ Rini.  Specifically, both Drs. Kinast and Bavis found the claimant should avoid working at heights, climbing,

operating moving "power" machinery, operating a motor vehicle, and like hazards (Ex. B5F/5; B6F/5).  Dr. Bavis also asserted no exertional limitations, and Dr. Kinast found jobs with "moderate stress" could be handled.  Full weight was also given to the essentially similar medical directive from the May 2013 sleep study that strongly advised the claimant to avoid driving or operating heavy equipment (Ex. B24F/6).

Tr. 60.

Brown's contention that the ALJ's reasons for providing little weight to her treating physicians' opinions were not "good reasons" is without merit.[13]

First, the ALJ concluded that Drs. Kinast and Bavis's opinions that Brown was fully compliant with her medication were not supported by record.  Tr. 60.  Thus, the ALJ found the accuracy and persuasiveness of their opinions weakened.  Tr. 60.  Brown states that she "flatly rejects the ALJ's rationale that the evidence conclusively establishes that she had been noncompliant with taking her anti-epileptic medication through the relevant period . . . [and argues that] the ALJ improperly substituted his own medical judgment for that of medical professionals, in particular for the judgment of Dr. Kinast."  Tr. 20.  However, Brown has not demonstrated that the ALJ's finding that the record demonstrates ". . . highly questionable compliance with [Brown] taking her anticonvulsant and antiepileptic medications . . ." (Tr. 56, 60) is unsupported by the record.

For example, as found by the ALJ, Brown's lab work has consistently showed subtherapeutic phenytoin levels, i.e., less than 10 mg/L.  Tr.  57; Tr. 509 (May 29, 2010 – PTN (Dilantin) level 7); Tr. 504 (August 19, 2010 – PTN level 8.8); Tr. 329 (February 12, 2011 – PTN level 5.0); Tr. 323 (August 24, 2011 – Phenytoin (Dilantin) level <2.5 L); Tr. 546 (January

---

[13] The ALJ gave little weight to Brown's treating physicians' opinions that she would likely miss two or more days of work per month as a result of her symptoms and that her seizures would be disruptive in the work environment. Tr. 60.  As indicated, however, the ALJ provided partial weight to the balance of Brown's treating physicians' opinions that environmental limitations would be required but exertional limitations would not be required and Brown could handle "moderate stress."  Tr. 60.

24, 2012 – Phenytoin (Dilantin) level < 2.5 L); Tr. 611 (December 29, 2012 – Dilantin level 0.9);

Tr. 632 (April 9, 2013, treatment notes reflecting that Brown's recent Dilantin level was less than

2.5).  The ALJ found that the foregoing subtherapeutic anticonvulsant levels were indicative of

Brown's lack of compliance with taking her medication, thus calling into question her treating

physicians' opinions premised upon their opinions that Brown was compliant with taking her

medication.  Tr. 338, 345.

Further, as found by the ALJ, treatment notes from two emergency room visits in 2012

also do not provide support for Drs. Kinast and Bavis's opinions that Brown was taking her

medication as prescribed.  Tr. 57.  For example, on February 28, 2012, Brown presented to

Mercy Medical Center's emergency room for a seizure.  Tr. 564-569.  Lab work dated February

28, 2012, showed that Brown's PTN level was 0.4.  Tr. 567.   Brown reported a slight headache

but no dizziness, no blurry vision, no neck, chest, or abdominal pain, and no shortness of breath.

Tr. 564.  The emergency room physician recorded the following notes:

> The patient had a seizure at 8:30.  The patient's last seizure was back in February.
> At first, the patient states she was taking her medications and then after we talked
> with her some more after I explained to her that her blood level was 0, she
> admitted that she has been cutting back on her benzos because she was feeling
> dizzy and so she thought it was part of the Dilantin.

Tr. 564.

The emergency room physician's impression was "[a]cute breakthrough seizure

secondary to noncompliance."  Tr. 564.  Brown was given Tylenol for her headache which was

not of the migraine type.  Tr.  564.  Brown was also given Dilantin and counseled on the need for

her to take her Dilantin or otherwise risk breakthrough seizures.  Tr. 564.  Brown was stable on

discharge.  Tr. 564.

On April 4, 2012, while visiting her sister at Mercy Medical Center, Brown became very emotional and had a seizure.  Tr. 558-563.  Brown was actively seizing while at the hospital and was observed opening her eyes at different times, coming out of the seizure for a bit, and then closing her eyes.  Tr. 559.  She was also foaming at the mouth.  Tr. 559.  Brown slowly came out of the seizure on her own.  Tr. 559.   Dilantin levels were obtained and recorded as less than 0.4.  Tr. 563.  The emergency room physician's diagnosis was seizure with a belief that Brown had a seizure because of noncompliance and stress.  Tr. 558.  Brown was advised to take her medication, follow up with her treating physician, and return to the emergency room if her condition worsened.  Tr. 558.

Brown acknowledges that noncompliance is a possible explanation for her subtherapeutic levels but takes issue with the ALJ's apparent lack of consideration of other possible explanations for her subtherapeutic levels such as medication conflicts or Brown's metabolic or absorption rates and/or the ALJ's failure to consult a medical expert or re-contact Dr. Kinast for clarification.  Doc. 12, pp. 21-22.

Brown's claim that the ALJ erred because he did not consider Brown's metabolic or absorption rates as a possible explanation for her subtherapeutic anticonvulsant levels is without merit.  As set forth in SSR 87-6, *The Role of Prescribed Treatment in the Evaluation of Epilepsy*, 1987 WL 109184 (1987) ("SSR 87-6"), "[t]he predominant reason for low anticonvulsant blood levels is that the individual is not taking the drugs as prescribed." SSR 87-6, * 3.  A finding that an individual's specific issues with absorption or metabolism of the drug is the cause of subtherapeutic levels "must be based on specific descriptive evidence provided by the treating physician." *Id.*  Thus, [u]nless convincing evidence is provided that subtherapeutic blood drug levels are due to abnormal absorption or metabolism, and the prescribed drug dosage is not itself

inadequate, the conclusion should follow that the individual is not complying with the treatment." *Id.*; *see also Slusher v. Astrue*, 2011 WL 924312, * 6 (N.D. Ohio Mar. 14, 2011).

The burden to demonstrate disability rests with Brown.  Further, a finding that subtherapeutic levels are related to a claimant's individual issues with absorption or metabolism requires specific evidence from a treating physician.  However, Brown's physician did not provide such evidence.  In fact, as acknowledged by Brown, although invited to provide an explanation for any recent subtherapeutic anticonvulsant levels, Dr. Kinast did not provide one. Doc. 12, p. 22, n. 12.  Accordingly, Brown's attempt to argue that the ALJ erred in not considering or finding that Brown's subtherapeutic levels were the result of an issue with Brown absorption rates or metabolism is unpersuasive and without merit.  *Slusher*, 2011 WL 924312, * 7 (without evidence that claimant's treating physician diagnosed claimant as having a problem with absorption of his seizure medication, claimant's contention that his subtherapeutic levels were not the result of noncompliance failed).

Further, Brown's claim that, pursuant to SSR 96-5p, the ALJ was obligated to re-contact Dr. Kinast for clarification of his opinion is without merit.  SSR 96-5p, *Medical Source Opinions on Issues Reserved to the Commissioner*, 1996 WL 374183 (July 2, 2006) ("SSR 96-5p") provides that an ALJ should make "every reasonable effort" to recontact a treating source for clarification regarding the reasons for his opinion where the following two situations exist: (1) "the evidence does not support a treating source's opinion on any issue reserved to the Commissioner" *and* (2) "the adjudicator cannot ascertain the basis of the opinion from the case record."  SSR 96-5p, *6; *see also Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 273 (6th Cir. 2010).  Thus, an obligation to recontact a treating physician arises "only when the information received is inadequate to reach a determination on claimant's disability status, not where . . . the

28

ALJ rejects the limitations recommended by that physician." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 156, n. 3 (6th Cir. 2009); *see also Ferguson*, 628 F.3d at 274-275 (relying on and quoting *Poe*, 342 Fed. Appx. 149, 156, n. 3).   Here, the ALJ was not unable to ascertain the basis of Dr. Kinast's opinion nor unable to reach a determination regarding Brown's disability status.   Rather, based on an extensive review of the record as a whole, the ALJ concluded that Brown's treating sources' opinions that Brown would likely miss two or more days of work per month due to her impairment or treatment and/or Dr. Kinast's opinion that Brown's seizures would likely disrupt work were not supported by the record.  Tr. 60.

Furthermore, "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."   *See Poe*, 342 Fed. Appx. at 157; *see also* 20 C.F.R. § 416.946(c); 20 C.F.R. § 416.927(e)(2). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 Fed. Appx.  at 157.  Where the record contains sufficient evidence for an ALJ to decide a disability claim absent expert medical testimony, a failure to solicit expert medical testimony will not serve as a basis to reverse an ALJ's decision. *See Williams v. Callahan*, 1998 WL 344073, *4 n. 3 (6th Cir. 1998) (finding that because the record contained the claimant's extensive medical history, the ALJ did not err in not soliciting expert medical testimony).

Here, the record contained extensive medical history as well as medical opinions, including those from Brown's own treating physicians.  Brown has not shown that such information was insufficient for the ALJ to determine her disability claim or that the ALJ acted improperly or substituted his judgment for that of a medical professional.    Based on his review and consideration of the evidence, the ALJ, in accordance with the regulations assessed Brown's

RFC.   In doing so, the ALJ included RFC restrictions to account for those limitations that he found supported by the record.  For example, the ALJ included mental stress related limitations in the RFC to address the fact that stress was identified as a factor giving rise to Brown's seizures.  Tr. 59.  However, the ALJ found that, based on the totality of the evidence, the record did not support any greater limitations than those included in the RFC and did not support likely absenteeism two to three days per month, whether due to her seizures or due to a combination of her other impairments.  Tr. 59-60.  Brown has not demonstrated that reversal and remand is warranted for further development of the record and/or analysis of the evidence.

Brown's contentions that the ALJ's other stated reasons for discounting Drs. Kinast and Bavis's opinions were not "good reasons" are also without merit.   The ALJ properly considered the fact that Dr. Kinast's opinion that Brown's seizures would likely disrupt co-workers at work was not consistent with the bulk of the evidence which reflected that Brown's seizures typically occurred at nighttime and thus would not likely be disruptive to co-workers during the workday. Tr. 60; *see* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Further, when weighing the evidence, the ALJ properly considered the fact that the postictal manifestations of Brown's seizures and sleepiness that were documented in her treating physicians' opinions were based primarily on subjective reports rather than objective medical findings.  *See e.g. Poe*, 342 Fed. Appx. at 156 (treating physician's opinion not entitled to deference because it was based on claimant's subjective complaints rather than objective medical data); *see also Thomas v. Barnhart*, 105 Fed. Appx. 715, 717 (6th Cir. 2004) (ALJ properly rejected medical opinion based in part on subjective complaints, which were not supported by objective medical findings).

Also, while the ALJ considered and noted the possibility that a treating physician may express opinion in an attempt to assist a patient with whom he sympathizes and noted that Dr. Kinast expressed support for Brown's attempts to obtain social security, the possibility of bias was not the ALJ's sole reason for discounting Dr. Kinast's opinion.  *See e.g. Harvey v. Comm'r of Soc. Sec.*, 2014 WL 5847617, * 7 (E.D. Mich. Nov. 12, 2014) (acknowledging that the ALJ commented on a treating physician's potential sympathy towards his patient but also rejected the opinion due to its inconsistency and conclusory nature).

In accordance with the treating physician rule, the ALJ thoroughly considered, weighed, and sufficiently explained the reasons for the weight he assigned to Brown's treating physicians' opinions.   Brown has not demonstrated error with respect to the ALJ's decision to provide less than controlling weight to the opinions of her treating physicians.   Accordingly, Brown has not demonstrated that reversal and remand is warranted for further consideration of the medical opinion evidence.

**B.**     **The ALJ properly assessed Brown's credibility**

Brown argues that the ALJ improperly assessed her credibility.  Doc. 12, pp. 23-24.  She contends that the ALJ improperly relied upon discrepancies between her mother's description of her seizures and her own account of her seizures, including their respective reports of the length of her seizures, i.e., less than one minute up to two minutes versus two to four minutes.   Doc. 12, pp. 23-24.  Brown also contends that the ALJ improperly relied upon her seizures occurring at nighttime as opposed to during the day to conclude that she would not have any greater work-related limitations of function and improperly analyzed the issue of her medication compliance. Doc. 12, p. 23.

Social Security Ruling 96–7p and 20 C.F.R. § 416.929 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c); Soc. Sec. Rul. 96-7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Consistent with the regulations, the ALJ considered in detail Brown's allegation that the frequency, nature and effect of her seizures resulted in her inability to perform any work.  Tr. 55-58.  He considered the evidence regarding the type of seizures that Brown typically had noting

that the evidence documented a very limited number of "big," i.e., grand mal, seziures.  Tr.  56.
The ALJ considered the timing of Brown's seizures, which was typically at nighttime while she
was sleeping.  Tr. 56.  The ALJ considered that there was some inconsistency between Brown's
reports to Dr. Kinast regarding the length of her seizures and her mother's reports of the length
of the seizures, noting that Brown's mother detailed seizures lasting between two and four
minutes while it was reported to Dr. Kinast that Brown's seizures were up to two minutes but
typically shorter.  Tr. 56.  In conjunction with his consideration of the discrepancies in the
reported length of the seizures, the ALJ noted that Brown had reported to her neurologist that her
seizures were milder in intensity and that she was coming out of her seizures more quickly.  Tr.
56.

   The ALJ also considered the issue of medication compliance, finding, as discussed more
fully above, that laboratory testing suggested that Brown was not fully compliant with taking her
seizure medication.  Tr. 56-57.  More particularly, the ALJ stated:

> Based on this replete evidence of laboratory testing and the February 2012
> emergency-room record where she admitted not taking one of her prescribed
> anticonvulsant medications, the undersigned finds that her continuing seizures at
> two times per month do not occur in the context of full compliance with
> treatment, and thus the argument that she could not sustain employment even with
> this treatment because of likely absenteeism rate of two or more days per month
> loses considerable evidentiary support.

Tr. 57.

   The ALJ also considered the lack of evidentiary support for Brown's claim that her
reported headaches as a postictal symptom were of such severity to support a finding that she
would likely be absent from work two or more days per month or to support limitations beyond
the postural, environmental limitations contained in the RFC assessment.  Tr. 58.

The ALJ also considered Brown's daily activities, noting that, except for being limited by the inability to drive, Brown was able to engage in activities of daily living, including taking public transportation alone.  Tr. 59.  Further, the ALJ noted that Brown's nonexistent work history raised some questions as to whether Brown's unemployment as of May 2011 was in fact the result of her medical problems.  Tr. 59.  Brown challenges the ALJ's reliance upon her lack of prior employment when assessing her credibility.  However, said consideration was not improper.  *See Williams v. Comm'r of Soc. Sec.*, 2014 WL 1406433, * 14 (N.D. Ohio Apr. 10, 2014) (finding that an ALJ properly considered a claimant's prior work history when assessing a claimant's credibility).

Brown disagrees with the ALJ's credibility assessment and challenges the ALJ's evaluation of the evidence.  However, the Court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."  *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).  Further, the ALJ's analysis was not limited to a single piece of evidence and is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment and whether that determination is supported by substantial evidence.  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 4.  In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Brown's impairments is supported by substantial

evidence.  Accordingly, Brown's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

November 2, 2015

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).